DCHF

**FILED**

SEP 3 0 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                                    )     Case No. 12-10946-B-7
                                                         )
Ronald Dee Monteverde,                                   )
Catherine Geal Monteverde,                               )
                                                         )
            Debtors.                                     )
_____ )
                                                         )
Ronald E. Toomajian and Gloria                           )     Adversary Proceeding No.  12-1078
E. Toomajian, Trustees of the                            )
Ronald E. Toomajian and Gloria                           )
E. Toomajian Declaration of                              )
Trust established June 25, 2003,                         )
                                                         )
            Plaintiffs,                                  )
                                                         )
     v.                                                  )
                                                         )
Ronald Dee Monteverde,                                   )
Catherine Geal Monteverde,                               )
                                                         )
            Defendants.                                  )
_____ )

**MEMORANDUM DECISION REGARDING COMPLAINT
TO DENY THE DEBTORS' DISCHARGE**

This disposition is not appropriate for publication.  Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value.  See 9th Cir. BAP Rule 8013-1.

Russell W. Reynolds, Esq., appeared on behalf of plaintiffs, Ronald E. Toomajian and Gloria E. Toomajian, Trustees of the  Ronald E. Toomajian and Gloria E. Toomajian Declaration of Trust Established June 25, 2003.

Peter B. Bunting, Esq., appeared on behalf of debtors/defendants, Ronald Monteverde and Catherine Monteverde.

This adversary proceeding concerns the Debtors' right to a general discharge. The Plaintiffs, Ronald and Gloria Toomajian, Trustees (the "Toomajians"), contend that Ronald Monteverde's ("Ronald's") discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)[1] based on, *inter alia*, the alleged transfer and concealment of assets with the intent to hinder, delay and defraud creditors. The Toomajians also contend that both Ronald and Catherine Monteverdes' ("Catherine's") discharges should be denied pursuant to § 727(a)(4)(A), based on alleged false statements made under penalty of perjury in connection with the disclosure and valuation of assets in their bankruptcy schedules.

This adversary proceeding was tried before the court and taken under submission after the parties submitted proposed findings of fact and conclusions of law. The court has considered all of the evidence and read carefully the entire trial transcript. When difficult issues come before the court, and the evidence is inconclusive, the decision often must turn solely on the burden of proof. The Toomajians had the burden to prove that the numerous problems addressed in this adversary proceeding were, by applicable standards, egregious enough to deny both of the Debtors the discharge they are otherwise entitled to under the Bankruptcy Code. For the reasons set forth below, judgment will be entered for the Debtors. The complaint will be dismissed and their discharges shall be entered.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52 (made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052). The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 727 and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core

---

[1]Unless otherwise indicated, all bankruptcy, chapter, code section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated after October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23 ("BAPCPA").

2

1  proceeding pursuant to 28 U.S.C. § 157(b)(2) (J).

2  **Background and Findings of Fact.**

3  Pre-Bankruptcy Events.  Prior to this bankruptcy, the Debtors owned and operated

4  a business known as Valley Boat Emporium, Inc., a recreational boat dealership ("Valley

5  Boat").  In its best years, Valley Boat reported sales of up to 80 boats per month.  In

6  March 2007, Valley Boat leased a warehouse from the Toomajians.  Ronald personally

7  guaranteed Valley Boats's performance of the lease.  Valley Boat's sales dropped

8  dramatically when the economy soured and the business closed in 2008.  The Toomajians

9  filed a civil action against Ronald and Valley Boat in the Fresno County Superior Court in

10  December 2009.  In July 2011, they obtained a judgment against Ronald and Valley Boat

11  in the amount of $532,631.39.[2]  In December 2010, Ronald also suffered a judgment in

12  favor of Fresno Distributing Company, which is listed in the schedules in the amount of

13  $2,146.12.

14  In 2004, Ronald borrowed $70,000 from Catherine's sister and brother-in-law,

15  Pete and Janet Conrad, to fund the purchase of a vacant lot in Fresno.  The Conrads

16  obtained the money from a credit line with the Educational Employee's Credit Union

17  ("EECU").  For many months prior to the bankruptcy, the Debtors deposited

18  approximately $1,582 per month into an account the Conrads maintained at EECU to

19  track expenses related to a vacation home they owned at Shaver Lake (the "Cabin

20  Account").  Ronald testified, in essence, that $1,000 of these deposits was compensation

21  to the Conrads for his family's frequent use of the vacation home.  The remainder of the

22  monthly deposit covered the interest charges on the $70,000 loan.

23  The Toomajians contend that these deposits were intended to repay that $70,000

24  loan.  However, the evidence is inconclusive as to how much, if any, of the $70,000 loan

25  was ever repaid by the Debtors, primarily because all of the transactions between the

26  _____

27  [2]The Toomajians timely filed a proof of unsecured claim based on the judgment in the
   amount of $563,366.04. The difference is presumably attributable to post-judgment interest and
28  attorney's fees.

Debtors and the Conrads were conducted informally and with little or no supporting documentation. The Toomajians also contend that the Debtors held and failed to disclose an equity interest in the vacation home as partners with the Conrads. Again, the evidence failed to show that the Debtors ever held a legal interest in the vacation home or that they enjoyed its use in any capacity other than as friends and members of the Conrad's family.

Ronald subsequently borrowed an additional $34,000 from the Conrads. Again, this loan was not formally documented and the evidence is inconclusive as to whether any of this loan was ever repaid prior to conveyance of the Desert Island property discussed below. At trial, Pete Conrad ("Pete") testified that the Debtors still owed him $104,000. Trial Tr. 10:13-16.

The Desert Island Property. In August 2010, Ronald deeded the residential property located on Desert Island Drive in Fresno, California ("Desert Island") to the Conrads. Trial Tr. Ex. 3. Pete testified regarding the personal loans he made to the Debtors which were not documented and had no due date. He also acknowledged the transfer of Desert Island, the fact that no escrow process was used and that no preliminary title report nor title insurance policy was obtained. Pete neither signed any documents in connection with the Desert Island transfer, nor did he make any inquiries about the condition of the financing or title of the property. He did not inspect the interior of Desert Island, nor did he obtain liability insurance for the property. Pete did not make the mortgage payments, neither did he pay the property taxes. Ronald continued to perform all of the "management" functions with regard to Desert Island.

The Toomijians contend that Desert Island was transferred in anticipation of an adverse judgment in the civil litigation. They also contend that the Conrads retained and failed to disclose an ownership interest in Desert Island. When Pete was asked by the Toomajians' counsel, whether or not he had given anything of value for Desert Island, he replied, "Just, that would have been, giving the Desert Island Property would have repaid us, if we could sell the property, for [the Debtors'] debt, the debt that they owed us." Trial Tr. 12:2-6. Pete stated that, if Ronald repaid the money owed to the Conrads, Pete

1  would have no reason not to reconvey Desert Island back to Ronald. Trial Tr. 17-18:17-
2  2. Pete never denied owning Desert Island.

3       The P.I. Claim.

4       In late December 2010, Ronald was allegedly assaulted and injured in an incident
5  involving the repossession of an automobile. The injury was serious enough that Ronald
6  consulted an attorney, Clark Roundtree, Esq., about the incident. The substance of that
7  conversation is unknown, but two years later, on or about December 30, 2012, Mr.
8  Roundtree contacted Ronald and told him he had one day left to file a personal injury
9  claim against the persons responsible for the December 2010 incident (the "P.I. Claim").
10  Ronald made appropriate arrangements and the P.I. Claim was filed in the state court on
11  December 31, 2012. Ronald immediately informed his attorney of the P.I. Claim and the
12  schedules were amended on January 3, 2013, to disclose the P.I. Claim. Ronald did not
13  claim an exemption for the P.I. Claim.[3] When asked at trial why the P.I. Claim had not
14  previously been disclosed, Ronald testified, in essence, that he had forgotten about the
15  P.I. Claim, the incident having occurred more than one year before the petition was filed.
16  **Other Transactions.**

17       The Toomajians offered evidence with regard to two diamond rings owned by the
18  Debtors. There is no dispute that the "furs and jewelry" were undervalued on the
19  Debtors' schedules, however, the biggest issue centers around Catherine's wedding ring.
20  The wedding ring was appraised in 1992 for $14,900. The Conrads obtained several
21  other estimates of the ring's value. At one point, Fresno Coin Gallery gave them an
22  estimate of $2,500. In contrast, Bianchi Jewelers gave them an estimate that the ring was
23  worth at least $11,000. However, The Ritz gave them an estimate of $2,800. In amended
24  schedules, the Debtors valued the wedding ring at $2,800. In March 2013, the chapter 7

25

26       [3]The court notes that, on September 6, 2013, it issued an order granting the trustee's
27  motion to employ special counsel to represent the estate in its prosecution of the P.I. Claim
    against Extreme Auto Recycling based on injuries arising from intentional and negligent tort and
28  personal injury.

1    trustee obtained approval to sell the wedding to plaintiff, Ron Toomajian for $5,300.

2         The Toomajians also offered evidence of a bank account at EECU, which they

3    shared with the Conrads, and two accounts at Central Valley Community Bank which also

4    bore the names of their daughters.  The accounts were not disclosed on the Debtors

5    schedules.  The Debtors explained the ownership of those accounts and that they had

6    signed documents to close or take their names off of the accounts long before the petition

7    was filed.  Notably, the chapter 7 trustee has not pursued recovery of these accounts.

8         The Toomajians also questioned the Debtors regarding the transfer of a 2002

9    Lexus to the daughter in December 2010.  The certificate of title was not perfected until

10   June 2011, less than one year before the bankruptcy.  The Debtors offered a credible

11   explanation of this transfer and the issue was not seriously pursued at trial or in the

12   Toomajian's proposed findings of fact and conclusions of law.

13        Finally, the Toomajians raise the issue of a storage facility that was not initially

14   disclosed in the schedules (the "Storage Unit").  This issue was explained by the Debtors

15   and not seriously pursued at trial.   Again, the chapter 7 trustee has not pursued any

16   interest in the storage unit or its contents, so the court is not persuaded that omission of

17   the storage unit was material.

18        The Bankruptcy.  This bankruptcy case commenced on February 2, 2012.  With the

19   petition, the Debtors filed all required schedules and the statement of financial affairs.

20   The petition, the schedules and the statement of financial affairs include affirmative

21   statements made under penalty of perjury, signed by the Debtors, declaring that they had

22   read the documents and that the documents were truthful and accurate to the best of their

23   knowledge, information and belief.[4]

24   _____

25        [4]Pursuant to this court's General Order 03-04 dated October 24, 2003, bankruptcy
     petitions and schedules may be signed, verified and filed electronically.  For all cases filed
26   after January 2, 2003, the electronic filing system is the official record of the court.
     Documents which the debtors must sign may be filed with electronic signatures in the "/s/
27   Name" format.  Use of the "/s/ Name" signature format constitutes the filing attorney's
28   representation "that an originally signed copy of the document exists and is in the [attorney's]

On schedule I, Ronald listed his occupation as a "Self-employed Consultant" for the last one and one-half years, and Catherine listed her occupation as "Human Resource Manager" at California Manufacturing for three years. The Debtors listed their two 19-year-old daughters as dependents. Ronald's monthly income was reported to be $9,835, composed of $5,500 from the operation of a business or profession, $4,135 income from real property, and $200 from "property management." Catherine's gross income was listed as $4,166. On schedule J, the Debtors reported monthly expenses of $9,058 which included regular expenses from operation of a business or profession of $4,721.31. Total monthly expenses were listed as $9,058.31, leaving a net income of $4,129.22, before the mortgage payment on their home. On their schedule A, the Debtors listed their primary residence, and three rental properties, two of which had values in excess of their mortgages.

The Debtors amended their schedules and SOFA several times. On their original schedule B, the Debtors listed their assets as:

    1) Cash on hand of $50;

    2) Central Valley Community Bank checking account 5001 for $169.18;[5]

    3) Wells Fargo Bank checking accounts 5935, at .67, and 9963 at $0;

    4) Union Bank checking account 1593, of $7.34;

    5) Educational Employees CU savings/checking 1316 of $12.86;

    6) Bank of America checking 0775, of $29.65; and

    7) West America Bank checking "co-owned with former business partner, not used by Debtor in 3 years," at $107.51.

The Debtors listed Household Goods and Furnishings valued at $4,500, two unframed Thomas Kinkade paintings at $200, wearing apparel at $500, personal jewelry at $1,000; two bicycles, snow skis with gear, misc. hand tools, and a 30-year-old

---

possession at the time of filing." (General Order 03-04, ¶ 10(d)).

[5]Items in italics are those that were changed in subsequent amendments.

7

1    Remington Shot gun, together valued at $430; four whole life policies with Allstate

2    Insurance with a total cash value of $5,452.86; a 2003 GMC Yukon XL Denali at $5,000,

3    and a 2006 GMC Sierra pick-up at $19,000.  The Debtors used California Code of Civil

4    Procedure § 703 to exempt all of the equity in the residence and their personal property.

5    They did not exempt the equity in their rental properties.  On schedule D they listed the

6    debt on their residence and rental properties and abstracts of judgment, including the one

7    recorded by the Plaintiffs.

8        The Debtors disclosed multiple civil suits and administrative proceedings and a

9    2011 foreclosure of real property.  Other than the payment to their attorney, the Debtors

10    listed the following transfers: two Sea-Doo water crafts and trailers with a fair market

11    value of $15,000 sold to a private party in 2010; a 2002 Lexus RX300 transferred to their

12    daughter in December 2010, with the notation that the car had been hers since age 16

13    (three years prior to filing), and a 2005 Lexus GX 470 in February 12, 2012, transferred

14    for "value received $17,000," to Catherine's brother, John Carlson.[6]

15        The Debtors also listed the Desert Island transfer to Pete as follows: "Transferred

16    rental property located at: 2294 Desert Island, Fresno CA, value received $35,000.  Title

17    transfer was subject to a mortgage of approximately $120,000."

18        First Amended Schedules.  On March 28, 2012, the Debtors amended schedules B

19    and C, and the SOFA.  Schedule B was amended to reduce the amount in the Central

20    Valley Community Bank checking account 5001 to $70.12, and to add an accounts

21    receivable in the amount of $2,500.  Schedule C was amended to include each of these

22    changes and additions as exempt property.  The SOFA was amended to change the value

23    received from the Desert Island transfer so that the entry read: "recorded 8/23/10,

24    Transferred rental property located at: 2294 Desert Island, Fresno, CA, value received

25    $70,000, + $34,000.  Title transfer was subject to a mortgage of approximately

26

27        [6]The court approved the compromise of a controversy pertaining to this vehicle and the
28    Debtors paid $6,500 to the trustee for the benefit of the estate.

$120,000." It was also changed to add a forklift sold to a private party in July or August 2011 for $7,500. In addition, the SOFA was amended to disclose as closed bank accounts, "daughter's (sic) savings accounts 3526 & 3535" on February 2, 2012, with a closing balance of $14, at Central Valley Community Bank.

On May 4, 2012, the Toomajians filed this adversary proceeding contesting, *inter alia*, the truthfulness and accuracy of the Debtors' schedules. Specifically, the Toomijians challenged the disclosures with regard to the transfer of Desert Island, transfer of the 2005 Lexus to John Carlson, transfer of the 2002 Lexus to their daughter, non-disclosure of an inheritance, and non-disclosure of the contents of the Storage Unit.

Second Amended Schedules. Five months after the compliant was filed, on November 12, 2012, the Debtors again amended schedules B, C, E, G, and the SOFA. The amended schedule B changed the "personal jewelry" entry so that it read: "Personal jewelry includes 14k yellow gold wedding ring w/1.8 carat and 1.0 carat diamonds, evaluated by two (2) different jewelers. $2,500 to $2,800. All other jewelry is costume and of negligible value."[7] The total value of the jewelry was listed as $2,800. The description of the shotgun was changed to "30 yr old Ted Williams (Sears & Roebuck) 2.2 12 gauge semi-automatic shot gun" and the value of the total entry was reduced to $400.

Disclosed for the first time as "other personal property" was the Storage Unit, located at 3515 W. Dakota Ave., Fresno California.[8] The total value of the property in

---

[7]After an order by the court, the trustee conducted an auction at which the ring was sold to the Plaintiffs for $5,300.

[8]The items in the storage unit were described in the amended schedules as: "Debtor's (sic) contents: baby furniture, kid's toys & games, pin ball machine and sports equipment, diatamatious earth (removed post-petition and used in pool filter), canvas covers, miscellaneous office supplies, miscellaneous office equipment, display rack, old outboard motors, 55 gal gear lube, Valley Boat Emporium business records. Misc. Household items, ladders, building materials; such as tile, tar paper, mastic and other misc. roofing supplies and misc. hand tools and garden tools. None of these items individually are

9

the Storage Unit was stated to be $500, and the property was listed on the second

amended schedule C as exempt. The Franchise Tax Board was added as a priority

creditor on schedule E for the amended 2010 taxes in the amount of $2,145. Schedule G

was amended to show a month-to-month rental agreement with Roger Shuh, the owner of

rental property located on Capitola Avenue in Fresno. Ronald was a sub-leasee of the

Capitola Ave. property from Roger Shuh, and re-leased it to unidentified tenants. The

second amended SOFA included additional income in the amount of $3,813.17 from

"McGrane Family Trust," September 2011. The SOFA was also amended to show that

Linda Devine, Catherine's sister, owned some of the property in the Storage Unit.[9]

The final pre-trial conference in this adversary proceeding was held on November

15, 2012, and the matter was scheduled for a two-day trial to begin on February 15, 2013.

Third Amended Schedules. Approximately seven weeks after the final pre-trial

conference, the Debtors amended schedule B and the SOFA for a third time on January 3,

2013. The amended SOFA disclosed the P.I. Claim, which had just been filed in the

Fresno County Superior Court on December 31, 2012. The amended SOFA also added

this claim as a pending lawsuit.

**Issues Presented.**

The issues in this adversary proceeding stem from the Toomajian's contentions,

first, that Ronald transferred and concealed Desert Island and the 2005 Lexus with the

intent to hinder, delay and defraud creditors, specifically the Toomajians. The

Toomajians further contend that both Debtors knowingly and fraudulently made materially

false statements under penalty of perjury in connection with the disclosure and valuation

_____

worth more than $500. Debtor's sister-in-law Linda Devine is also storing personal items
in this storage, see SOFA #14."

[9]Ms. Devine's property was described as: "table & chairs, desk & cabinets, fireplace
insert, desk chair, light fixtures, ceiling fans, plumbing supplies, car parts, old truck frame and
parts, nuts & bolds, electric parts, shop vacuum, tool cart w/ misc. hand tools, dolly, nothing is
worth more than $500 for any one item."

of assets in their bankruptcy schedules.

**Applicable Law.**

Denial of a discharge is a severe sanction and § 727 is construed strictly in favor of the debtor. *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 227 (E.D.N.Y. 2000). However, a bankruptcy discharge is a privilege and may only be granted to the honest debtor. *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 501 (Bankr. E.D. Cal. 2001) (citing *Dubrowsky v. Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000)).

Under § 727(a)(2), a debtor's discharge may be denied upon a showing that, "the debtor, with *intent to hinder, delay, or defraud a creditor* or [the trustee], has *transferred*, removed, destroyed, mutilated, or *concealed* . . . . property of the debtor, within one year before the date of the filing of the petition . . . ." *Id., emphasis added*. The "look back" period under § 727(a)(2) for purposes of contesting a discharge is one year before commencement of the bankruptcy. However, the Ninth Circuit has adopted the "continuing concealment" doctrine. *See Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240–41 (9th Cir. 1997). In *Lawson*, the court explained, "[A] transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing." *Id.* at 1240.

Denial of discharge under § 727(a)(4)(A) requires the plaintiff to show that the debtor *knowingly and fraudulently*, in or in connection with the case, made a false oath or account. (Emphasis added.) The false oath or account must relate to a "material fact." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999) (citing *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990)). The "false oath" may be a false statement or an omission in the schedules. *Id.* (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

The purpose of laws such as § 727(a)(4) is "'to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the

11

1  reality of their affairs.'" *In re Leija*, 270 B.R. at 501 (quoting *Boroff v. Tully (In re*

2  *Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)).  Section 727(a)(4) is intended to enforce the

3  debtor's duty of disclosure and to ensure that those with an interest in the administration

4  of the estate receive reliable information.  *Bensenville Cmty. Ctr. Union v. Bailey (In re*

5  *Bailey)*, 147 B.R. 157, 163 (Bankr. N.D. Ill. 1992).  "'Bankruptcy Trustees lack the time

6  and resources to play detective and uncover all the assets and transactions of their

7  debtors.'" *Id.* (quoting *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 997

8  (Bankr. N.D. Ill. 1992)).  As the Ninth Circuit has said, "'courts should construe § 727

9  liberally in favor of debtors and strictly against parties objecting to discharge.'" *Retz v.*

10  *Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernard v. Sheaffer (In*

11  *re Sheaffer)*, 96 F.3d 1279, 1281 (9th Cir. 1996)).  However, that "does not alter the

12  burden on the objector, but rather means that 'actual, rather than constructive, intent is

13  required' on the part of the debtor." *Id.* (quoting *Khalil v. Developers Sur. & Indem. Co.*

14  *(In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd*, 578 F.3d 1167 (9th Cir.

15  2009)).

16        When the debtor signs and files his or her bankruptcy schedules, the debtor attests,

17  under penalty of perjury, that the facts represented therein, including the disclosure of

18  assets, are complete and accurate.  That said, the Bankruptcy Code also recognizes that

19  bankruptcy schedules will not always be complete and accurate.  Federal Rules of

20  Bankruptcy Procedure liberally allow the amendment of bankruptcy schedules to address

21  this reality: "A voluntary petition, list, schedule, or statement may be amended by the

22  debtor as a matter of course at any time before the case is closed." Rule 1009(a)

23        The signing and verification of bankruptcy schedules under penalty of perjury

24  constitute an "oath" for purposes of § 727(a)(4). *In re Leija*, 270 B.R. at 502–03.  The

25  false "oath or account" must be as to a material fact. *In re Wills*, 243 B.R. at 62.

26  Materiality is defined broadly; a false statement or omission "may be material even if it

27  does not cause direct financial prejudice to creditors." *Id.* at 62–63.  "Since § 727(a)(4)

28  relates to the discovery of assets and enforces debtors' duty of disclosure, an omission can

12

1  be material, even if the creditors were not prejudiced by the false statement." *In re*

2  *Bailey*, 147 B.R. at 163. Conversely, "a false statement or omission that has no impact on

3  a bankruptcy case is not material and does not provide grounds for denial of a discharge

4  under § 727(a)(4)(A)." *In re Khalil*, 379 B.R. at 172.

5       The false statements must be made both "knowingly" and "fraudulently." *See In*

6  *re Retz*, 606 F.3d at 1198. Courts have interpreted the knowledge element to require

7  more than carelessness or recklessness. In *Roberts v. Erhard (In re Roberts)*, the

8  Bankruptcy Appellate Panel held that the debtor must act "deliberately and consciously"

9  in failing to make the subject disclosures. 331 B.R. 876, 883–84 (9th Cir. BAP 2005),

10  *aff'd*, 241 F. App'x 420 (9th Cir. 2007). The court further held that neither carelessness

11  nor recklessness "measure[s] up to the statutory requirement of 'knowing' misconduct."

12  *Id.* at 884.

13       The objecting party must also show that the debtor "fraudulently" made a false

14  oath, and the fraudulent intent must be actual, not constructive. *In re Wills*, 243 B.R. at

15  64. As one court has opined,

16      The party objecting to the discharge must show that the information was
    omitted for the specific purpose of perpetrating a fraud and not simply

17      because the debtor was careless or failed to fully understand his attorney's
    instructions . . . . [I]t is important to note that under section 727(a)(4)(A), a

18      reckless indifference to the truth is sufficient to sustain an action for fraud.

19  *In re Murray*, 249 B.R. at 228 (alterations in original) (quoting *In re Dubrowsky*, 244

20  B.R. at 571–72).

21       In *Retz*, the Ninth Circuit clarified the use of reckless indifference or disregard for

22  the truth in showing intent. *See* 606 F.3d at 1198–99. "Intent is usually proven by

23  circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless

24  indifference or disregard for the truth may be circumstantial evidence of intent, but is not

25  sufficient, alone, to constitute fraudulent intent." *Id.* at 1199 (citations omitted).

26  **Analysis and Conclusions of Law.**

27       <u>Concealment Relating to the Desert Island Property.</u>  It is undisputed that Desert

28  Island was deeded to the Conrads in August 2010, more than one year before

13

1    commencement of the bankruptcy. Therefore, § 727(a)(2) is inapplicable unless the

2    "continuing concealment" principle applies. It is clear that the Debtors did not try to

3    conceal the actual Desert Island transfer; the Conrad's deed is and always has been a

4    matter of public record. However, there is a dispute over the manner in which the

5    transaction was characterized in the schedules. The Toomajians contend that Ronald's

6    recorded transfer of Desert Island to the Conrads, and the manner in which it was

7    described in the bankruptcy schedules, was intended to conceal Ronald's retention of an

8    ownership interest in the Property. They contend that the Debtors had already repaid

9    much, if not all of the money they had borrowed from the Conrads and that the purported

10   Desert Island transfer was a sham.

11       Not every interest that is concealed rises to the level of invoking the continuing

12   concealment doctrine. *In Finalco, Inc. v. Roosevelt (In re Roosevelt)*, 176 B.R. 534 (9th

13   Cir. BAP 1995), Brandt, J, *dissenting, aff'd* 87 F3d 311, *as amended* 98 F3d 1169, *en*

14   *banc review denied, cert denied* 520 U.S. 1209 (1997), the court ruled that the delay in

15   recording a fraudulent transfer transmuting a husband's interest in a home to his wife,

16   despite the husband's continued residence in the home and execution of a homestead

17   declaration, would not support the continuing concealment doctrine. Nor, said the court,

18   was the perfection of the interest a transfer.

19       The court is not persuaded that the Desert Island transaction was done in an effort

20   to defraud any creditors. The evidence offered to suggest that the Conrad's debt had

21   already been repaid was inconclusive and simply not persuasive. The Debtors considered

22   the transaction a means of paying a creditor, the Conrads who were still owed $104,000 at

23   the time. The preferential payment of a creditor is specifically authorized under state law.

24   Cal.Civ.C. 3432.[10] The fact that distinguishes the Desert Island transaction from the

25   typical "fraud" cases cited by the plaintiffs, is that the Debtors did not reside in Desert

26

27       _____

28   [10]Cal.Civ.C 3432 states: "A debtor may pay one creditor in preference to another, or may
     give to one creditor security for the payment of his demand in preference to another."

14

Island and the owed the Conrads a significant amount of money.[11]  "[A] mere preferential transfer, without more, is not the equivalent of a fraudulent transfer for purposes of an objection to discharge and would not constitute further evidence of actual fraud." *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 576 (Bankr. E.D.N.Y. 2000).  Based on the record, the testimony, and the evidence presented, the court is persuaded that the Desert Island transfer was motivated by Ronald's desire to ensure that his debt to the Conrads would be paid, either through the Conrad's ownership of Desert Island, or a subsequent sale of the property.  Notable is the fact that the trustee has not attempted to avoid the Desert Island transfer to recover anything from it for the creditors.  The fact that the Conrads may have been willing to reconvey Desert Island after being paid from another source, does not mean that the Debtors retained any legally cognizable interest in the property.

    Failure to Disclose the P.I. Claim.[12]  Ronald's interest in the P.I. Claim should have been disclosed in the original schedules so that the chapter 7 trustee could investigate the extent of that claim and determine if it could be liquidated and made

---

[11]The Toomajians cite the case of *Rosen v. Bezner*, 996 F.2d 1527 (3rd Civ. 1993) for the proposition that the concealment of an interest in property can be fraudulent.  In *Rosen*, the debtor transferred his interest in the family residence to his wife, without any consideration, then continued to live in the residence and pay the mortgage.  Reversing a summary judgment ruling for the trustee, the court of appeals held that there was a triable issue of material fact as to whether the debtor retained a secret interest in the property.
    The Toomajians also cite the case of *Thibodeaux v,. Oliva*, 819 F.2d 550 (5th Cir. 1987) for the same proposition.  There again, the debtors transferred title to their residence to their mother, for no consideration, but continued to live in and maintain the house.

[12]The failure to disclose the P.I. Claim was not pled in the complaint due primarily to the fact that the P.I. Claim was not disclosed to anyone until the amended schedules were filed on January 3, 2013, about seven weeks after the final pre-trial conference and seven weeks before the scheduled trial.  The Toomajians included the P.I. Claim in their pre-trial statement dated February 12, 2013, and their attorney examined Ronald, without objection, on the P.I. Claim issue at the trial.  Ronald's attorney gave him an opportunity to explain the P.I. Claim during cross-examination and addressed the issue in his proposed findings of fact and conclusions of law.  The P.I. Claim is therefore properly before the court and open for consideration in this memorandum.

available for the creditors.  However, the injury occurred more than one year before the bankruptcy was filed.  Ronald told his bankruptcy attorney about the P.I. Claim and amended the schedules as soon as it was brought to his attention by attorney Roundtree. Ronald's explanation of the omission of the P.I. Claim from the Debtors' schedules was believable and the Toomajians were unable to offer any evidence to rebut that explanation.  The court is not persuaded that the omission of the P.I.'s Claim from the original schedules was done with fraudulent intent.

**Catherine Monteverde Is Entitled to A Discharge.**  As to Catherine, the only issues explored at trial were (1) the valuation of her wedding ring, and (2) the failure to disclose some old bank accounts that bore the Debtors' names.  There was no questioning of Catherine regarding the 2005 Lexus, the Storage Unit, nor the P.I. Claim.  These issues were essentially abandoned by the Toomajians as to Catherine and the court will consider only the issues as to which testimony was presented.  Upon careful consideration of the testimony and evidence, the Toomajians did not meet their burden of showing that the omissions on the schedules were made knowingly and with fraudulent intent on Catherine's part.

With regard to the Desert Island, no evidence was submitted or developed during testimony to show that she knew anything other than the fact that the property had been transferred to the Conrads.  She was apparently not involved in the property's "management" in the way that Ronald was.  Catherine knew that her wedding ring had been appraised for $14,900 many years before the bankruptcy was filed.  However, she was not directly involved in the process of valuing the ring for purposes of stating its value on the bankruptcy schedules.[13]  The ring was fully disclosed, it just was not properly valued.  With regard to the three bank accounts (the Cabin Account at the Credit Union and two accounts opened for her twin daughters), Catherine credibly explained her

---

[13]For health reasons, Catherine apparently played a minimal role in the preparation of the bankruptcy schedules.  She testified that most of the work, and interaction with her attorney was handled by Ronald.

16

1   belief that the accounts had been closed long before the bankruptcy.  Trial Tr. 66:9–14;

2   69:15-23.  Although Catherine reviewed and signed the inaccurate schedules, the SOFA,

3   and the amendments, this fact alone, in the absence of some intent to commit a fraud, is

4   an insufficient basis upon which to deny her discharge under § 727(a)(4)(A).

5   **Conclusion.**

6          Based on the foregoing, there is no dispute that the Debtors' schedules were

7   initially incomplete as evidenced by the several amendments.  However, the court is not

8   persuaded that the Debtors transferred or concealed any property within one year prior to

9   the bankruptcy with *intent to hinder, delay, or defraud* any creditor or officer of the

10  bankruptcy estate.  (11 U.S.C. § 727(a)(2)(A)).  Likewise, the court is not persuaded that

11  the Debtors *knowingly and fraudulently* made a false oath or account in connection with

12  this case.  (11 U.S.C. § 727(a)(4)).  Accordingly, judgment will be entered in favor of the

13  Debtors.  Their discharges shall be entered and the complaint shall be dismissed.  All

14  parties shall bear their own costs and attorney's fees.

15         Dated:  September ___30___, 2013

16

17                                          _____

18                                          W. Richard Lee
                                            United States Bankruptcy Judge

19

20

21

22

23

24

25

26

27

28

17

1

2

3

4    **Instructions to Clerk of Court**
     **Service List - Not Part of Order**/Judgment

5

6         The Clerk of Court is instructed to send the Order/Judgment or other court
     generated document transmitted herewith to the parties below.  The Clerk of Court will
7    send the Order via the BNC or, if checked ____, via the U.S. mail.

8         Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the
     case), and  X   Other Persons Specified Below:

9

10   Russell W. Reynolds, Esq.
     Attorney at Law
11   499 W. Shaw Ave., Ste. 116
     Fresno, CA 93704

12
     Office of the U.S. Trustee
13   U.S. Courthouse
     2500 Tulare Street, Suite 1401
14   Fresno, CA 93721

15

16

17

18

19

20

21

22

23

24

25

26

27

28